ALLEN & OVERY LLP
1221 Avenue of the Americas
New York, New York 10020
Telephone:  (212) 610-6300
Facsimile:  (212) 610-6399
Ken Coleman
Mark Nixdorf

*Attorneys for FTI Consulting Canada Inc., as
Monitor and Foreign Representative of
The Cash Store Financial Services Inc.*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------x
In re:                                                          :     Chapter 15
                                                                :
THE CASH STORE FINANCIAL SERVICES INC.,  :
                                                                :     Case No.  ___-_____ (___)
Debtor in a Foreign Proceeding.                      :
                                                                :
-------------------------------------------------------------------x

**VERIFIED PETITION FOR RECOGNITION
OF FOREIGN PROCEEDING AND RELATED RELIEF**

FTI Consulting Canada Inc. is the court-appointed monitor (the "**Monitor**") and

authorized foreign representative of The Cash Store Financial Services Inc. ("**CSF**"), The Cash

Store Inc., TCS Cash Store Inc., Instaloans Inc., 7252331 Canada Inc., 5515433 Manitoba Inc.,

and 1693926 Alberta Ltd. d/b/a "The Title Store" (collectively, the "**Cash Store Applicants**"),[1]

in a proceeding under Canada's *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36

(as amended, the "**CCAA**") pending before the Ontario Superior Court of Justice, Commercial

List (the "**Ontario Court**").

The Monitor has commenced this chapter 15 case ancillary to CSF's proceeding

under the CCAA (the "**Canadian Proceeding**") and respectfully files this *Verified Petition for*

---

[1]    CSF, The Cash Store Inc., TCS Cash Store Inc., and Instaloans Inc. have formally changed their names and are currently registered as the following Ontario and Alberta numbered companies: 1511419 Ontario Inc., 1545688 Alberta Inc., 986301 Alberta Inc., and 1152919 Alberta Inc.

*Recognition of Foreign Proceeding and Related Relief* (the "**Petition**"), with accompanying documentation pursuant to sections 1504 and 1515 of title 11 of the United States Code (as amended, the "**Bankruptcy Code**"), seeking the entry of an order substantially in the form annexed hereto as <u>Exhibit A</u> (the "**Proposed Order**") recognizing the Canadian Proceeding as a "foreign main proceeding" under section 1517 of the Bankruptcy Code and giving full force and effect in the United States to certain provisions of the Plan of Compromise and Arrangement under the CCAA relating to CSF, dated October 6, 2015 (as the same may be amended, revised or supplemented in accordance with its terms, the "**Plan**"),[2] subject to the prior entry of an order of the Ontario Court sanctioning the Plan (the "**Plan Sanction Order**").

As described in the Meetings Order of the Ontario Court dated September 30, 2015 (the "**Meetings Order**")[3] and the Plan Filing Order dated October 6, 2015 (the "**Plan Filing Order**"),[4] affected creditors' votes on the Plan are now being solicited and a hearing to consider whether to sanction the Plan and thereby make it binding in Canada is scheduled for November 19, 2015 (the "**Sanction Hearing**").  This ancillary case has been commenced prior to the Sanction Hearing in order to expedite implementation of the Plan and permit distributions to creditors at the earliest possible date.  To align this ancillary case with the main proceeding as closely as possible, and thereby minimize cost and delay, the Monitor is proposing that this Court consider at a single hearing this Petition for recognition of the Canadian Proceeding and the Monitor's request for enforcement of those aspects of the Plan that relate to CSF's affairs in the United States.  The relief requested by the Monitor with respect to the Plan is conditioned on the prior entry of the Plan Sanction Order by the Ontario Court.  If the order is entered, a copy

---

[2]     A copy of the Plan is annexed as <u>Exhibit M</u> to the *Declaration of Ken Coleman* dated October 16, 2015, and filed contemporaneously herewith (the "**Coleman Declaration**").
[3]     A copy of the Meetings Order is annexed as <u>Exhibit B</u> to the Coleman Declaration.
[4]     A copy of the Plan Filing Order is annexed as <u>Exhibit D</u> to the Coleman Declaration.

will be filed with this Court prior to the hearing on this Petition and will be available on the

Monitor's website at http://cfcanada.fticonsulting.com/cashstorefinancial/.

In support of this Petition, the Monitor respectfully states as follows: [5]

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157

and 1334, and the "Amended Standing Order of Reference Re: Title 11" of the United States

District Court for the Southern District of New York (Preska, C.J.) dated January 31, 2012.

2.      This case has been properly commenced pursuant to section 1504 of the

Bankruptcy Code by the filing of this Petition for recognition of the Canadian Proceeding

pursuant to section 1515 of the Bankruptcy Code.  This is a core proceeding pursuant to section

157(b)(2)(P) of title 28 of the United States Code, and the Court may enter a final order in

respect of it under Article III of the United States Constitution.

3.      Venue is proper in this District pursuant to 28 U.S.C. § 1410(2) and (3)

because CSF is a defendant in a class action in this District, and venue here is otherwise

consistent with the interests of justice and convenience of the parties having regard to the relief

sought by the Monitor.

4.      CSF is eligible to be a debtor under chapter 15 pursuant to sections 109(a)

and 1501(b) of the Bankruptcy Code.  CSF has a USD 50,000 retainer held in the United States

by Conway Mackenzie, Inc. since 2014, and a retainer held in the United States by Rothschild

Inc. since 2014, the balance of which is USD 21,532.09.  *See Drawbridge Special Opportunities*

---

[5]      Statements of fact in this Petition are made by the Monitor in reliance upon information supplied to the Monitor by or on behalf of the Cash Store Applicants, including (i) unaudited financial information for the Cash Store Applicants, (ii) the Cash Store Applicants' books and records, (iii) certain financial information prepared by the Cash Store Applicants, and (iv) discussions with management of the Cash Store Applicants.  In particular, all statements of fact pertaining to the Cash Store Applicants historical operations and any developments occurring prior to the commencement of the Canadian Proceeding and the appointment of the Monitor on April 14, 2014, are derived entirely from information supplied to the Monitor by or on behalf of the Cash Store Applicants.  The Monitor has not audited, reviewed, or otherwise attempted to verify the accuracy or completeness of this information.

*Fund LP v. Barnet (In re Barnet)*, 737 F.3d 238, 248-49 (2d Cir. 2013) (applying section 109(a)'s local property requirement to chapter 15 cases); *In re Octaviar Admin. Pty Ltd.*, 511 B.R. 361, 372-73 (Bankr. S.D.N.Y. 2014) (holding cash in client trust account maintained by the foreign representatives' U.S. counsel satisfied the section 109(a) requirement); *In re OAS S.A.*, Case No. 15-10937, (Bankr. S.D.N.Y. Aug. 3, 2015) (finding chapter 15 debtors' deposit accounts, interests in funds in the custody of the Sheriff of New York City, and interest in client trust accounts sufficient for eligibility under section 109(a)); *In re Suntech Power Holdings Co.*, 520 B.R. 399, 412 (Bankr. S.D.N.Y. 2014) (finding chapter 15 debtor's interest in bank account sufficient for 109(a) eligibility); *see also In re Global Ocean Carriers, Ltd.*, 251 B.R. 31, 38-39 (Bankr. D. Del. 2000) (retainers held by local attorneys of debtors suffice for eligibility under section 109(a)). Further, assistance is sought in the United States by the Monitor in connection with the Canadian Proceeding for the benefit of creditors and other interested persons of CSF.

5.      The statutory predicates for the relief requested herein are sections 105(a), 1504, 1507, 1515, 1517, 1520, and 1521 of the Bankruptcy Code.

## BACKGROUND

6.      For a more complete description of the business, corporate organization, and capital structure of CSF and its affiliates (together, "**Cash Store**"), and the circumstances leading to the Canadian Proceeding and the formation of the Plan, the Court is respectfully referred to: (i) the *Affidavit of Steven Carlstrom* sworn to April 13, 2014, (the "**Carlstrom Affidavit**"), (ii) the *Factum of the Applicants* dated April 13, 2014 (the "**Factum**"), (iii) the *Pre-Filing Report of the Monitor* dated April 14, 2014 (the "**Pre-Filing Report**"), and (iv) the *Affidavit of William E. Aziz* sworn to September 23, 2015 (the "**Aziz Affidavit**"). These

documents were submitted to the Ontario Court and are annexed as Exhibits E, F, G and K, respectively, to the Coleman Declaration.[6]

***The Cash Store Applicants***

A.    Business

7.    Cash Store was a leading provider of alternative financial products and services to individuals that were generally unable to obtain financing from traditional sources.[7] Shortly before commencing the Canadian Proceeding, Cash Store's business represented approximately 35 percent of Canada's CAD 2.5 billion payday lending market.[8]

8.    Cash Store operated under two principal business lines: (i) the direct lending business line and (ii) the brokered lending business line.  The business lines and types of products offered varied by jurisdiction based primarily on regulatory differences in the provinces and territories in which Cash Store operated.[9]  Through its direct lending business, Cash Store acted as a payday lender in Alberta, British Columbia, Nova Scotia, and Saskatchewan. [10]  It also formerly acted as a direct lender in Manitoba and Ontario, until it switched to offering line of credit products in those jurisdictions. [11]  As a direct lender, Cash Store typically provided customer advances ranging from CAD 100 to CAD 1,500.[12]  The due dates on these advances were generally the customers' next payday, but never exceeded 62-days due to applicable regulations.[13]  Through its brokered lending business, Cash Store acted as an intermediary on

---

[6]    In addition, the Court is respectfully referred to (i) the *Information Statement* dated October 7, 2015 (the "**Information Statement**"), (ii) the *Affidavit of William E. Aziz* sworn to April 27, 2014 (the "**April Aziz Affidavit**"), (iii) the *Second Report to the Court Submitted by FTI Consulting Canada Inc., in Its Capacity as Monitor* dated April 27, 2014 (the "**Second Monitor's Report**"), and (iv) the *Sixth Report to the Court Submitted by FTI Consulting Canada Inc., in Its Capacity as Monitor* dated June 6, 2014 (the "**Sixth Monitor's Report**") which are also annexed to the Coleman Declaration as Exhibits L, H, I, and J, respectively.  These and other documents relating to the Canadian Proceeding are available on the Monitor's website at http://cfcanada.fticonsulting.com/cashstorefinancial/.

[7]    Factum ¶ 7.

[8]    Factum ¶ 7.  For informational purposes only, the Reuters CAD/USD exchange rate for October 14, 2015 at 8:18 AM (EDT) was CAD 1 = USD 0.7705.

[9]    Information Statement at 1.

[10]    Factum ¶ 15.

[11]    Factum ¶ 15.

[12]    Factum ¶ 16.

[13]    Factum ¶ 17.

behalf of customers with third party lenders ("**TPLs**") providing financing in New Brunswick, Newfoundland, Northwest Territories, Prince Edward Island and the Yukon Territory.[14]   The brokered loans were repaid to Cash Store and were either remitted to the applicable TPL or maintained by Cash Store's for new borrowers.[15]   Cash Store generated revenues from interest on its direct loans and fees charged on brokered loans.[16]

B.    Organizational Structure

9.    CSF is incorporated under the *Ontario Business Corporations Act*, R.S.O. 1990, c. B16 with its registered office located in Toronto.[17]   Its stock was publicly traded on the Toronto Stock Exchange (TSX:CSF) until May 23, 2014, when it was delisted for failure to meet continued listing requirements of the TSX, particularly as a result of commencing the Canadian Proceeding.[18]   CSF was also listed on the New York Stock Exchange (NYSE: CSFS) until it delisted voluntarily on February 28, 2014, due in part to non-compliance with the NYSE's market capitalization, shareholders' equity, and share price requirements.   As of December 31, 2013, CSF had 17,571,813 common shares outstanding, of which 3,915,700, or approximately 22.2%, were beneficially owned by CSF's directors and senior executive officers.[19]   Coliseum Capital Management, LLC ("**Coliseum**") owned 19.27% of CSF's common shares.[20]

10.    The other Cash Store Applicants are all privately held corporations that are either direct or indirect wholly-owned subsidiaries of CSF.[21]   The chart below shows the organizational structure of Cash Store.   Included in parentheses is the respective jurisdiction of incorporation of each entity.[22]

---

[14]    Factum ¶ 18.
[15]    Factum ¶ 19.
[16]    Factum ¶ 9, 14.
[17]    Carlstrom Affidavit ¶ 24.
[18]    April Aziz Affidavit ¶ 22.
[19]    Carlstrom Affidavit ¶ 12 (ownership figures as of December 11, 2013).
[20]    Carlstrom Affidavit ¶ 12.
[21]    Carlstrom Affidavit ¶ 24.
[22]    Carlstrom Affidavit ¶ 13.



C.    Operations

11.    The principal Canadian operating subsidiaries of CSF were The Cash Store Inc. and Instaloans Inc., which acted as both lenders and/or brokers in all of the Canadian provinces and territories in which Cash Store conducted its business.[23]  In addition, 1693926 Alberta Ltd., doing business as "The Title Store", offered loans secured by motor vehicles, TCS Cash Store acted as lessee for all of the leased Cash Store retail locations, and 5515433 Manitoba Inc., owned property in Manitoba and served as landlord for two Manitoba store locations.[24]  The other Canadian subsidiaries were essentially inactive at the commencement of the Canadian Proceeding, including The Cash Store Financing Corporation, 1677547 Alberta Ltd., and 7252331 Canada Inc.[25]

12.    Cash Store operated primarily in Canada with relatively limited business activity in the United Kingdom.  Its September 30, 2013 Annual Report indicated 510 branches in Canada as compared to only 27 branches in the United Kingdom.[26]  In particular, Cash Store's chief place of business was Ontario.[27]  As of the commencement of the Canadian Proceeding, there were 176 Cash Store branches and approximately 470 employees located in Ontario, far

[23]    Carlstrom Affidavit ¶ 15.
[24]    Carlstrom Affidavit ¶ 16.
[25]    Factum ¶ 12.
[26]    The September 30, 2013 Annual Report is annexed as Exhibit O to the Coleman Declaration.
[27]    Carlstrom Affidavit ¶ 23.

7

exceeding the number of branches and employees in any other province or territory in which Cash Store operated.[28] Further, Cash Store's Chief Compliance and Regulatory Affairs Officer was located in Toronto because that was where it faced its most significant regulatory challenges.[29] Indeed, the Ontario operations of Cash Store accounted for CAD 57.6 million in revenue for the fiscal-year ending September 30, 2013, roughly 30% of total revenue, and more revenue than from any other province or territory.[30]

     D.   <u>Principal Stakeholders</u>

13. As of December 31, 2013, Cash Store had total liabilities of approximately CAD 184,984,000.[31] These liabilities were comprised of three primary sources reflected in the chart below.[32]

| Stakeholder | Maturity Date | Amount | Rate of Return |
|---|---|---|---|
| Senior Secured Lenders | November 29, 2016 | CAD 12 million | 12.5% |
| Secured Noteholders | January 31, 2017 | CAD 132.5 million | 11.5% |
| Third Party Lenders | N/A | CAD 42 million | Effectively 17.5% |

14. On November 29, 2013, CSF entered into a credit agreement (the "**Credit Agreement**") with Coliseum, 8028702 Canada Inc., and 424187 Alberta Ltd. (collectively, the "**Senior Secured Lenders**").[33] Pursuant to the Credit Agreement, the Senior Secured Lenders provided CAD 12 million in loans.[34] These loans are guaranteed by CSF, The Cash Store Inc., TCS Cash Store Inc., Instaloans Inc., 7252331 Canada Inc., 5515433 Manitoba Inc., The Cash Store Limited, The Cash Store Financial Limited, and CSF Insurance Services Limited

---

[28]    Carlstrom Affidavit ¶ 23.
[29]    Carlstrom Affidavit ¶ 23.
[30]    Carlstrom Affidavit ¶ 24.
[31]    Factum ¶ 23.
[32]    Factum ¶ 24.
[33]    Factum ¶ 25.
[34]    424187 Alberta Ltd., which loaned CAD 2.0 million of the CAD 12.0 million drawn, is a company controlled by CSF's CEO and director, Gordon Reykdal. Coliseum, which loaned CAD 5.0 million of the CAD 12.0 million drawn, owns 19.27% of the common shares of CSF. 8028702 Canada Inc., which loaned the remaining CAD 5.0 million of the CAD 12.0 million drawn, is a company controlled by the same person who controls McCann Family Holding Corporation, one of CSF's principal TPLs. The loans under the Credit Agreement were used to fund operations and growth in key business areas. Carlstrom Affidavit ¶ 60.

(collectively, the "**Guarantors**").[35]  The loans made under the Credit Agreement bear a 12.5%

annual interest rate, with a 14.5% default rate, and mature on November 29, 2016.[36]  Upon

default, the Senior Secured Lenders have the right, *inter alia*, to accelerate the obligations under

the Credit Agreement and enforce against security.  As of March 2014, CSF was in breach of a

number of covenants under the Credit Agreement, including failure to pay its March 29, 2014

interest payment.  Such breaches constituted defaults or gave rise to defaults with the passage of

time.[37]

15.     On January 31, 2012, CSF issued, through a private placement in Canada

and the United States, CAD 132.5 million of 11.5% Secured Notes (the "**Notes**" and their

holders the "**Secured Noteholders**").[38]  The Notes mature on January 31, 2017 and bear interest

on the aggregate principal amount from the date of issue at 11.5% per annum payable on a semi-

annual basis.[39]  However, the Notes were issued at a discount resulting in an effective yield of

13.4%.[40]  CSF used the majority of the proceeds of the Notes to acquire a portfolio of consumer

loans and certain intangible assets, and to settle pre-existing relationships with certain TPLs.[41]

The Notes are guaranteed, jointly and severally, by the Guarantors under the Credit Agreement.[42]

The commencement of the Canadian Proceeding breached a covenant in the indenture for the

Notes and the total amount outstanding became immediately due and payable.[43]

16.     Pursuant to the Collateral Trust and Intercreditor Agreement (the

"**Collateral Trust Agreement**") entered into in connection with the Notes, CSF granted liens on

all of its existing and future property, and all existing and future property of certain subsidiaries,

---

[35]     Carlstrom Affidavit  ¶ 59.
[36]     Carlstrom Affidavit ¶ 61.
[37]     Factum ¶ 26.
[38]     Carlstrom Affidavit ¶ 69.
[39]     Carlstrom Affidavit ¶ 70.
[40]     Carlstrom Affidavit ¶ 70.
[41]     Carlstrom Affidavit ¶ 70.
[42]     Carlstrom Affidavit ¶ 71.
[43]     Factum ¶ 29.

subject to specified permitted liens and exceptions.[44]    Under the Collateral Trust Agreement, the

loans made under the Credit Agreement were granted first-priority liens while the Notes are

secured on a second-priority basis.[45]

*Events Leading to the Canadian Proceeding*[46]

17.    Prior to the commencement of the Canadian Proceeding, Cash Store faced

a number of challenges, including regulatory issues affecting its core business strategy, multiple

class actions requiring defense across Canada and in the United States, and cash flow problems,

all of which resulted in a significant deterioration in liquidity and the need to commence the

Canadian Proceeding for the benefit of all stakeholders.[47]

A.    Regulatory Issues

18.    In May 2007, the Canadian federal government enacted a bill which

provided that certain payday loans were not subject to the criminal interest rate provisions of the

*Criminal Code*, R.S.C., 1985, c. C-46 (the "**Criminal Code**") if they were within specific dollar

amounts and maturity periods.[48]    However, in order for payday loan companies to rely on this

exemption, provincial governments were required to enact legislation that included a licensing

requirement, measures to protect consumers, and limits on the total cost of borrowing.[49]

19.    As various provinces enacted local legislation pursuant to the federal

exemption in the Criminal Code, the payday loan market became significantly more regulated.[50]

This regulatory overhaul which resulted in a diverse patchwork of legislation hampered Cash

---

[44]    Carlstrom Affidavit ¶¶ 64, 71.
[45]    Carlstrom Affidavit ¶¶ 64, 71.
[46]    The statements of fact in this section are made by the Monitor upon information and belief, and in reliance on information supplied to the Monitor by or on behalf of the Cash Store Applicants.
[47]    Carlstrom Affidavit ¶ 87.
[48]    Carlstrom Affidavit ¶ 89.
[49]    Carlstrom Affidavit ¶ 90.
[50]    Carlstrom Affidavit ¶ 91.

Store's strategy to design a single business model for its payday lending operations across Canada and drastically increased regulatory costs.[51]

20.    In particular, Cash Store encountered significant regulatory challenges in Ontario, where it generated most of its revenues.  On June 7, 2013, the director designated under the *Ministry of Consumer and Business Services Act*, R.S.O. 1990, c. M.21, filed an application in the Ontario Superior Court of Justice seeking a declaration that Cash Store's basic line of credit product was subject to the *Payday Loans Act*, 2008, S.O. 2008, Ch. 9 (the "**Payday Loans Act**"), and that a broker's license (the "**Broker's License**") was required in order to continue offering this product.[52]  On February 12, 2014, the Ontario Superior Court of Justice found that the line of credit product was subject to the Payday Loans Act and entered an order barring Cash Store from offering the line of credit product until it received a Broker's License.[53]  Although Cash Store appealed the decision, it was forced to immediately cease offering all line of credit products in Ontario.[54]

21.    Further, on February 15, 2014, additional regulations came into force in Ontario under the Payday Loans Act that required Cash Store to also obtain a lender's license (the "**Lender's License**") to continue offering certain line of credit products.[55]  Cash Store applied for a Lender's License in advance of the regulations coming into force; however on March 27, 2014, the Ontario Registrar denied Cash Store's application and Cash Store was ineligible to re-apply for a license for 12 months.[56]  As a result, Cash Store was prohibited from offering new loans in its principal place of business.[57]

---

[51]    Carlstrom Affidavit ¶ 92.
[52]    Carlstrom Affidavit ¶ 96.
[53]    Information Statement at 2.
[54]    Carlstrom Affidavit ¶¶ 96-97.
[55]    Information Statement at 2.
[56]    Information Statement at 2.
[57]    Information Statement at 2.

22.     Various other regulatory initiatives were implemented at both the federal and provincial levels that further hindered Cash Store's business such as its title loan and line of credit offerings in Manitoba.[58] Cash Store was also subject to regulatory actions in British Columbia and Manitoba, a criminal investigation in Newfoundland, and additional regulatory issues arose in Nova Scotia and New Brunswick.[59]

B.     Litigation

23.     Cash Store's difficult financial position was further threatened by multiple significant legal proceedings across Canada and in the United States.  These proceedings include class actions in Canada regarding its business model, primarily related to fees and interest rates charged, (the "**Consumer Class Actions**"), and regarding its compliance with securities laws in Canada and the United States (the "**Securities Class Actions**").[60] Such proceedings exposed Cash Store to significantly increased legal costs and potentially substantial liability.[61]

24.     The Consumer Class Actions allege breaches of various provincial payday loan regulations, consumer protection acts, and/or criminal interest provisions in the Criminal Code.[62] They generally seek one or more of the following remedies: restitution or damages for allegedly unlawful charges paid by the class members, repayment of unlawful charges paid by the plaintiff and class members, damages for conspiracy, interest on all amounts found to be owing, and legal costs.[63]

25.     The Securities Class Actions include actions in Alberta, Ontario, and Quebec against CSF and certain of its directors and officers (the "**D&Os**") alleging misrepresentations in its financial statements during the period from November 24, 2010 to

---

[58]     Factum ¶ 42.
[59]     Factum ¶ 42.
[60]     Factum ¶ 42.
[61]     Factum ¶ 42.
[62]     Carlstrom Affidavit ¶¶ 119-120.
[63]     Carlstrom Affidavit ¶¶ 119-120.

February 13, 2014 regarding (i) internal controls over financial reporting and (ii) valuation of certain items including a loan portfolio acquired from TPLs, losses on an internal consumer loan portfolio, and liability associated with the settlement of a Consumer Class Action in British Columbia.[64]  In addition, CSF and certain D&Os are defendants in a class action in the United States (the "**US Securities Class Action**") alleging violations of the Securities Exchange Act of 1934, 15 U.S.C. § 78a.[65]  The US Securities Class Action is pending before Judge Marrero in the United States District Court for the Southern District of New York (the "**District Court**") and captioned *Globis Capital Partners, L.P. et al. v. Cash Store Financial Services, Inc. et al.*, 13 Civ. 3385 (S.D.N.Y.) (VM).  Pursuant to the District Court's July 30, 2015 order requiring lead plaintiffs to provide status reports, counsel to the lead plaintiffs have kept the District Court apprised of developments in the Canadian Proceeding and the intention to commence this chapter 15 case in two separate letters dated August 5, 2015 and September 9, 2015 (the "**Status Report Letters**").[66]

C.       Liquidity Problems

26.       At the commencement of the Canadian Proceeding, Cash Store did not have sufficient cash to continue operations.[67]  As of February 28, 2014, there was CAD 12.2 million in Restricted Cash available for consumer lending.[68]  Further, two TPLs requested the return of their Restricted Cash, which Cash Store could not satisfy thus prompting one of the TPLs to commence additional litigation against Cash Store seeking injunctive relief.[69]

---

[64]       Carlstrom Affidavit ¶ 121
[65]       Carlstrom Affidavit ¶ 121.
[66]       Copies of the Status Report Letters are annexed as Exhibits M and N to the Coleman Declaration.
[67]       Factum ¶ 42.
[68]       Factum ¶ 42.
[69]       Factum ¶ 42.

*Initial Restructuring Efforts*

27.     To combat these challenges, Cash Store established a Special Committee of its Board of Directors (the "**Special Committee**") on February 19, 2014, advised by its own legal counsel and financial advisors, and began exploring options for a sale, restructuring, refinancing or liquidation. [70]  In addition, the Special Committee hired a Compliance and Regulatory Affairs Officer to address regulatory compliance issues and develop relationships with applicable regulators.[71]  The Special Committee's financial advisors, Rothschild Inc., began canvasing interest in a sale or investment transaction for Cash Store (the "**Sale Process**"), and although a number of parties entered into nondisclosure agreements and began due diligence, Cash Store ultimately commenced the Canadian Proceeding prior to a completed transaction. [72]

*The Canadian Proceeding*

28.     The Cash Store Applicants commenced the Canadian Proceeding on April 14, 2014 to provide a breathing space to explore restructuring options and avoid further erosion of value. [73]  At the commencement of the Canadian Proceeding, the Ontario Court issued an Initial Order (the "**Initial Order**") which provided certain relief under the CCAA. [74]   Among other things, the Initial Order, (i) stayed proceedings against the Cash Store Applicants, (ii) prevented parties from altering or terminating agreements with the Cash Store Applicants, (iii) appointed the Monitor, and (iv) authorized the Cash Store Applicants to continue managing and operating their property, restructure their business, and file the Plan.

---

[70]     Factum ¶ 43.
[71]     Factum ¶ 43.
[72]     Factum ¶ 43.
[73]     Information Statement at 2-3.
[74]     Information Statement at 2-3.

A.        The DIP Credit Facility

29.        On April 15, 2014, the Ontario Court granted an Amended and Restated Initial Order (the "**Amended & Restated Initial Order**")[75] that, *inter alia*, appointed a Chief Restructuring Officer for the Cash Store Applicants and approved a CAD 8.5 million interim credit facility from Coliseum Capital LP, Coliseum Capital Partners II LP and Blackwell Partners LLC (the "**Initial DIP**").[76] Cash Store's forecasted budget showed more than CAD 8.5 million would be required by the third week of the Canadian Proceeding; therefore, it was contemplated that further DIP financing would be required.[77]

30.        On May 17, 2014, the Ontario Court issued an order that approved CAD 6 million of additional funding with a CAD 2 million extension option (the "**Amended DIP**") provided by the lenders party to the Initial DIP, Alta Fundamental Advisers, LLC and certain members of an ad hoc committee of Secured Noteholders (the "**Ad Hoc Secured Noteholders Committee**").[78] The total availability under the Amended DIP was CAD 14.5 million with a CAD 2 million extension option.

B.        Asset Sales

31.        The Sale Process continued during the Canadian Proceeding and resulted in three separate asset sale transactions whereby the Cash Store Applicants sold substantially all of their assets (the "**Asset Sales**"). These were approved by the Ontario Court on October 15,

---

[75]        A copy of the Amended & Restated Initial Order is annexed as Exhibit A to the Coleman Declaration. The Amended & Restated Initial Order also authorized the Monitor to act as a foreign representative. *See* Amended & Restated Initial Order ¶ 65 ("[T]he Monitor is authorized and empowered to act as a representative in respect of the within proceedings for the purpose of having these proceedings recognized in a jurisdiction outside Canada.").

[76]        Sixth Monitor's Report ¶¶ 2, 33-35.

[77]        Second Monitor's Report ¶ 8.

[78]        Sixth Monitor's Report ¶ 33.

2014, January 26, 2015 and April 10, 2015.[79]  Brief descriptions of the Asset Sales are provided below:[80]

- **National Money Mart Transaction**: the Cash Store Applicants entered into an asset purchase agreement with National Money Mart Company ("**NMM**") dated October 8, 2014, pursuant to which NMM agreed to purchase a significant portion of the Cash Store Applicants' business and assets, including 150 of the branches and a number of other assets, for a purchase price of CAD 51,129,141, subject to final adjustments.  NMM is one of Canada's largest payday loan lenders and has existing relationships with payday regulators.  The transaction with NMM closed on February 6, 2015.

- **easyfinancial Transaction**: the Cash Store Applicants entered into an asset purchase agreement with easyfinancial Services Inc. ("**easyfinancial**") on January 16, 2015 pursuant to which easyfinancial agreed to purchase the lease rights and obligations for 45 locations and certain other associated assets for a purchase price of CAD 2,504,338, subject to final adjustments.  The transaction with easyfinancial closed on February 9, 2015.

- **CSF Asset Management Transaction**: the Cash Store Applicants entered into an asset purchase agreement with CSF Asset Management Ltd. ("**CSF Asset Management**") on April 2, 2015 pursuant to which CSF Asset Management agreed to purchase certain receivables in respect of payday loans, lines of credit or other loans made by the Cash Store Applicants that were not sold as part of the NMM transaction, for a purchase price of CAD 650,000. The transaction with CSF Asset Management closed on April 14, 2015 and four monthly payments of CAD 15,000 (CAD 60,000) are outstanding.  These payments are due on the fifteenth day of each month.

32.    The proceeds from the Asset Sales (the "**Asset Sale Proceeds**") have been used to repay the principal of the Amended DIP (only certain fees remain outstanding) and fund operations and restructuring efforts.[81]  Since completion of the Asset Sales, there are minimal ongoing operational activities and the focus of the Cash Store Applicants and Monitor has been on various post-closing matters with respect to the Asset Sales, the orderly wind-down of the

---

[79]    Information Statement at 3.
[80]    *See* Information Statement at 3-4.
[81]    Information Statement at 4.

remaining business and assets, and the resolution of outstanding claims.[82]  The remaining Asset

Sale Proceeds, which are currently held in trust by the Monitor, together with remaining assets

and the settlement payments to be received under the settlement agreements discussed below, are

sufficient to repay the Senior Secured Lenders, but will not be sufficient to repay amounts owed

to the Secured Noteholders, who will suffer a deficiency under the Plan.[83]

C.    Estate Litigation

33.    During the course of the Canadian Proceeding, the Cash Store Applicants

identified potential claims they may have against certain of their former directors, officers,

advisors and other third parties (the "**Estate Claims**").[84]  In order to investigate and pursue these

claims on behalf of the Cash Store Applicants, the Cash Store Applicants received court approval

to retain Thornton Grout Finnigan LLP and Voorheis & Co LLP ("**Litigation Counsel**").[85]

34.    To date, Estate Claims have been brought against a number of third-party

defendants, certain of which have been settled, and certain of which remain outstanding (the

"**Remaining Estate Claims**").  The Remaining Estate Claims are potentially valuable assets of

the Cash Store Applicants' estates.[86]  Pursuant to the Plan, an individual will be designated to act

as litigation trustee with authority to instruct Litigation Counsel in relation to the prosecution of

the Remaining Estate Claims and a cash reserve will be established to be maintained and

administered by the Monitor for costs and any adverse awards that may be incurred in

connection with prosecuting the Remaining Estate Claims.[87]

---

[82]    Information Statement at 4.
[83]    Information Statement at 4.
[84]    Aziz Affidavit ¶¶ 9-10.
[85]    Aziz Affidavit ¶¶ 9-10.
[86]    Aziz Affidavit ¶ 11.
[87]    Aziz Affidavit ¶ 12.

D.      Settlements

35.      Together with the Ad Hoc Secured Noteholders Committee and the Monitor, the Cash Store Applicants have engaged in negotiations with various litigation claimants and other interested parties in an effort to resolve (i) numerous claims made against the Cash Store Applicants and their assets and (ii) numerous claims made by the Cash Store Applicants against third party defendants.[88] These extensive negotiations successfully resulted in multiple settlements (the "**Settlements**") which are incorporated in the Plan and will increase recoveries for the various stakeholders, including the Secured Noteholders and the class members of the various class actions.[89]

36.      Relevant to the relief sought in this Petition, the plaintiffs in the Securities Class Actions (the "**Securities Class Action Plaintiffs**"), the plaintiffs in the Consumer Class Actions (the "**Consumer Class Action Plaintiffs**"), CSF, and the D&Os, entered a settlement agreement on September 22, 2015 (the "**D&O/Insurer Global Settlement Agreement**")[90] following two mediations before the Honorable Mr. George Adams, a retired Justice of the Ontario Superior Court of Justice.  Pursuant to the D&O/Insurer Global Settlement Agreement, the D&Os will pay a total of CAD 19,033,333 allocated as follows: (i) CAD 4,875,000 to settle the claims asserted by the Securities Class Action Plaintiffs against the D&Os on behalf of the Cash Store Applicants' shareholders; (ii) CAD 8,904,167 to settle the claims asserted by the Securities Class Action Plaintiffs against the D&Os on behalf of the Secured Noteholders; (iii) CAD 1,437,500 to settle the claims asserted by the Ontario Consumer Class Action Plaintiffs against the D&Os; (iv) CAD 1,066,666 to settle the claims asserted by the Western Canada Consumer Class Action Plaintiffs against the D&Os; and (v) CAD 2,750,000 to settle the claims

---

[88]      Aziz Affidavit ¶ 13.
[89]      Aziz Affidavit ¶ 24.
[90]      A copy of the D&O/Insurer Global Settlement Agreement in attached as Schedule C to the Plan.

asserted by the Cash Store Applicants against the D&Os, in exchange for the releases provided therein.[91]

37.     Specifically, the D&O/Insurer Global Settlement Agreement contemplates the full reciprocal release of all claims in any way related to CSF and its affiliates and subsidiaries among CSF, the D&Os, 424187 Alberta Ltd. in its capacity as Senior Secured Lender, the Securities Class Action Plaintiffs, the Ontario Consumer Class Action Plaintiffs, the Western Canada Consumer Class Action Plaintiffs, and William Aziz, in his capacity as the court-appointed Chief Restructuring Officer, on behalf of CSF as plaintiff.[92]

E.     The Plan[93]

38.     The Cash Store Applicants have formulated the Plan which has the support of the Monitor, the Ad Hoc Secured Noteholders Committee (representing approximately 70% of the Secured Noteholders), the Senior Secured Lenders, the Securities Class Action Plaintiffs, the Consumer Class Action Plaintiffs, and the other parties to the Settlements.[94]  The purpose of the Plan is to, among other things, (i) distribute proceeds of the Cash Store Applicants assets to their secured creditors according to their priorities, (ii) provide a central forum for the distribution of proceeds from the Settlements to various stakeholders according to their interests and entitlements, (iii) give effect to the releases contemplated for the Released Parties in exchange for the settlement payments made by those parties under the Settlements, and (iv) position the Cash Store Applicants to continue pursuing the Remaining Estate Claims for the benefit of stakeholders. [95]

---

[91]     Aziz Affidavit ¶ 23.  Capitalized terms have the meanings assigned to them in the Aziz Affidavit.  In addition, the CAD 2 million of first lien debt held by 424187 Alberta Ltd. as a Senior Secured Lender will be cancelled for no consideration under the Plan in exchange for its release, thereby increasing recoveries to the Secured Noteholders.  *Id*.

[92]     D&O/Insurer Global Settlement Agreement §§ 9-10.  Capitalized terms have the meanings assigned to them in the D&O/Insurer Global Settlement Agreement.

[93]     The summary of the Plan provided in this section is for information purposes only and is qualified in its entirety by the terms of the Plan.  Capitalized terms used but not defined herein shall have the meanings assigned to them in the Plan.

[94]     Aziz Affidavit ¶ 25.

[95]     Aziz Affidavit ¶ 25.

39.    Two classes of Affected Creditor Claims are contemplated under the Plan: (i) the Senior Lender Class, comprising the Senior Secured Lenders, and (ii) the Secured Noteholder Class, comprising the Secured Noteholders.  Only Affected Creditors are entitled to attend and vote on the Plan.  The Plan provides the following treatment for these classes:

> *The Senior Lender Class*.  Each Senior Secured Lender with an Allowed Senior Secured Credit Agreement Claim will receive payment in full of the outstanding principal owed to them plus accrued interest to the date of implementation of the Plan, less certain amounts to be paid as part of the Settlements.

> *The Secured Noteholder Class*.  Each Secured Noteholder will receive its *pro rata* share of the Cash Store Applicants' cash on hand following the payment to the Senior Lender Class and less certain reserves and other payments set forth in the Plan.  Each Secured Noteholder will also be entitled to its *pro rata* share of any proceeds recovered by the Cash Store Applicants following the implementation of the Plan, whether received by the Cash Store Applicants from the Remaining Estate Claims, tax refunds, reversions of the reserves or otherwise, to be distributed on a subsequent distribution date.

40.    In the event that there are sufficient funds to pay the Secured Noteholder Class in full, excess amounts will revert to the Cash Store Applicants for distribution pursuant to a further order from the Ontario Court.  In addition, the Plan provides for proceeds of the Settlements to be allocated and distributed to the Consumer Class Action Plaintiffs and the Securities Class Action Plaintiffs under the terms of the Settlements.  Certain categories of claims are Unaffected Claims which will not be affected by or receive distributions under the Plan.  Unaffected Claims are generally any claims other than the Senior Secured Credit Agreement Claims, the Secured Noteholder Claims and the Released Claims, including without limitation, all unsecured claims, other than any unsecured claims that are Released Claims, and certain claims subject to liens and charges established in the Amended & Restated Initial Order.

41.    Implementation of the Plan is conditioned on, among other things, the entry of the Plan Sanction Order following receipt of the requisite approval from the Affected Creditor Classes, the terms of the Settlements having been approved by the courts overseeing the

relevant class actions, and this Court's entry of an order recognizing the Canadian Proceeding and enforcing the Plan Sanction Order as it relates to the D&O/Insurer Global Settlement Agreement.[96]

F.    The Meetings Order

42.    The Ontario Court entered the Meetings Order on September 30, 2015, which authorizes the Cash Store Applicants to convene two separate meetings of their Affected Creditors, the Senior Secured Lenders and the Secured Noteholders, to consider and vote on the Plan (the "**Creditors' Meetings**").  The Creditors' Meetings are scheduled to take place on November 10, 2015.  The Meetings Order also establishes procedures for the calling and conduct of the Creditors' Meetings, including governance, entitlement to vote, and the tabulation of votes among the classes of Affected Creditors.  Specifically, the Meetings Order provides for oversight by the Monitor and sets the quorum required at each Creditors' Meeting as one Senior Secured Lender and one Secured Noteholder, in person or by proxy.  If the requisite quorum is not present at a Meeting, then such Meeting will be adjourned to such time and place as necessary or desirable.

43.    In order for the Plan to be approved pursuant to the CCAA, the Plan must be approved by a majority in number of Affected Creditors of each Affected Creditor Class representing at least two thirds in value of the Affected Creditor Claims of each Affected Creditor Class, in each case present and voting in person or by proxy at their respective Creditors' Meetings.  The Meetings Order does not involve any unsecured creditors or shareholders because based on the amount of Asset Sales Proceeds and other recoveries that are available for distribution, the Notes are the fulcrum security and the Secured Noteholders' will

---

[96]    *See* Plan ¶ 9.1(g) ("for purposes of the D&O/Insurer Global Settlement only, the U.S. Recognition Order shall have been made and shall be in full force and effect, provided, however, that the Plan Implementation Date shall not be conditional upon the U.S. Recognition Order in the event that the U.S. Recognition Order is not granted due to a lack of jurisdiction of the court").

suffer a deficiency under the Plan. It is anticipated that there will be no recovery for junior creditors and their claims will remain unaffected by the Plan. The Ontario Court entered the Plan Filing Order on October 6, 2015 accepting the Plan for filing.

G.    Sanction Hearing

44.    If the Plan is approved by the required majorities at the Creditors' Meetings, the Cash Store Applicants intend to seek approval of the Plan at the Sanction Hearing before the Ontario Court on November 19, 2015. The Monitor's request for an order of this Court enforcing the Plan Sanction Order in the United States as described herein is subject to the Ontario Court's entry of the Plan Sanction Order following the Sanction Hearing.

F.    Notice of the Plan and Settlements

45.    Notice of the Plan and Settlements provided in the Canadian Proceeding has been extensive. Pursuant to the Meetings Order, the Monitor has sent a comprehensive information package containing, among other things, a copy of the Plan, notice of the Creditors' Meetings, the Information Statement describing the Plan and voting proxies to all Affected Creditors. In addition, all of the documents in the information package were posted to the Monitor's website and the Monitor caused notice of the filing of the Plan and the Sanction Hearing to be published in *The Globe and Mail*, *The Edmonton Journal*, *The Australian* and *The Daily Telegraph*.[97]

46.    Additional notice in connection with the settlement of the Securities Class Actions as contemplated by the D&O/Insurer Global Settlement Agreement was provided in the Canadian Proceeding. Siskinds LLP, as representative counsel for all persons who acquired CSF securities from November 24, 2010 through to February 13, 2014, disseminated and published

---

[97]    *See* Meetings Order ¶¶ 8 – 23 (detailing notice approved by the Ontario Court in connection with the Plan and Creditors' Meetings).

notice pursuant to a notice plan (the "**Notice Plan**") approved by the Ontario Court.[98]    In

accordance with the Notice Plan, notice was served on, among others, (i) the current service list

in the CCAA Proceeding, (ii) lists provided by the Monitor of (a) Canadian non objecting

beneficial owners of CSF shares as of December 24, 2012, (b) U.S. non objecting beneficial

owners of CSF shares as of December 12, 2012, (c) registered holders of the Notes as of

December 20, 2013, and (d) private placement purchasers of $28 million of the Notes under the

$125 million offering in January 2012; (iii) 195 brokers in Canada including the Canadian

Depository for Securities, with a cover letter directing those brokers to provide notice, either

electronically or by mail, to those of their clients that are or have been beneficial owners of CSF

securities,[99] and (iv) the Indenture Trustee for the Notes with a direction to distribute notice to

those persons that are or have been registered holders of the Notes and for whom the Indenture

Trustee has contact information.  In addition, notice of settlement of the Securities Class Actions

under the D&O/Insurer Global Settlement Agreement was posted to the Siskinds LLP website in

English and French, and published in *The Globe and Mail*, *La Presse*, *Investor's Business Daily*,

*The Edmonton Journal*, and *The Wall Street Journal*.

## **RELIEF SOUGHT**

47.    By this Petition, the Monitor seeks the following relief:

(A)    recognition pursuant to section 1517 of the Bankruptcy Code of the

Canadian Proceeding as a "foreign main proceeding" as defined in sections 1502(4) of

the Bankruptcy Code;

---

[98]    A copy of the Representation and Notice Approval Order entered by the Ontario Court on September 30, 2015 is annexed as <u>Exhibit C</u> to the Coleman Declaration.  This Notice Plan was intended to be consistent with the notice that would otherwise be provided under Rule 23 of the Federal Rules of Civil Procedure.

[99]    For the avoidance of doubt, notice was similarly served on any brokers in the United States appearing on the aforementioned lists provided by the Monitor.

(B)      all relief afforded foreign main proceedings automatically upon recognition pursuant to section 1520 of the Bankruptcy Code, including, without limitation, application of the stay imposed by section 362 of the Bankruptcy Code, or if the Canadian Proceeding is a foreign nonmain proceeding, that this Court exercise its discretion to provide such relief;

(C)      enforcement in the United States of the releases contained in sections 7.1 (c), (d), (f), (g) and (n) of the Plan as contemplated by D&O/Insurer Global Settlement Agreement, and the injunctions contained in section 7.3 of the Plan, as approved by the Plan Sanction Order, pursuant to sections 105(a), 1507, and 1521 of the Bankruptcy Code; and

(D)      such other and further relief as is appropriate under the circumstances pursuant to sections 105(a), 1507, and 1521 of the Bankruptcy Code.

## <u>BASES FOR SUCH RELIEF</u>

### *Recognition of the Canadian Proceeding*

48.     For the reasons more fully discussed in the *Memorandum of Law* filed contemporaneously herewith, the Canadian Proceeding is entitled to recognition as a "foreign main proceeding" under section 1517 of the Bankruptcy Code because:

(A)      the Canadian Proceeding is (i) a "foreign proceeding" within the meaning of section 101(23) of the Bankruptcy Code and (ii) a "foreign main proceeding" within the meaning of section 1502(4) of the Bankruptcy Code because the Canadian Proceeding is pending in the location of CSF's center of main interests;

(B)    the Monitor is a "person" within the meaning of section 101(41) of the Bankruptcy Code and a "foreign representative" within the meaning of section 101(24) of the Bankruptcy Code; and

(C)    this Petition meets the requirements of sections 1504 and 1515 of the Bankruptcy Code.

49.    Moreover, recognizing the Canadian Proceeding would not be manifestly contrary to the public policy of the United States, as prohibited by section 1506 of the Bankruptcy Code.  In fact, granting recognition will promote the United States public policy of respecting foreign proceedings as articulated in, *inter alia*, sections 1501(a) and 1508 of the Bankruptcy Code and further cooperation between courts to the maximum extent possible as mandated by section 1525(a) of the Bankruptcy Code.  Thus, these circumstances satisfy the conditions for mandatory recognition of the Canadian Proceeding under section 1517 of the Bankruptcy Code.

### Enforcement of the Plan[100]

50.    In connection with the recognition of the Canadian Proceeding as a "foreign main proceeding," the Monitor seeks an order enforcing the Plan in the United States under sections 1521, 1507, and 105(a) of the Bankruptcy Code as it relates to the D&O/Insurer Global Settlement Agreement.  The Monitor believes that enforcement of the Plan is necessary to give effect to it in the United States.  It is important that certain releases provided in the Plan are given full force and effect in the United States in light of the pending US Securities Class Action.  Indeed such relief is expressly contemplated in section 5.9 of the Plan.[101]

---

[100]    Capitalized terms used but not defined herein shall have the meanings assigned to them in the Plan.

[101]    Plan § 5.9 *Foreign Recognition* ("As promptly as practicable following the Sanction Date, the Monitor shall commence an ancillary proceeding to the CCAA Proceeding under chapter 15 of the United States Bankruptcy Code in a court of competent jurisdiction in the United States requesting recognition of the CCAA Proceeding and requesting recognition and enforcement in the United States of the

51.    In this regard, the Monitor specifically requests that this Court enforce the following releases set forth in sections 7.1 (c), (d), (f), (g) and (n) of the Plan, and the injunctions contained in section 7.3 of the Plan, as approved by a Plan Sanction Order of the Ontario Court: (i) all Class Action Claims against the Cash Store Applicants and the D&Os, (ii) all Claims that have been or could be asserted against the Cash Store Applicants and the D&Os in the Class Actions, (iii) all D&O Claims against the D&Os, (iv) all Claims against the Cash Store Applicants by any of the Released Parties, except as set out in Schedule C of the D&O/Insurer Global Settlement Agreement and (v) all Claims against the Plan Settlement Parties and their legal and financial advisors in connection with the Plan and the transactions and settlements to be consummated thereunder and in connection therewith.   The Monitor seeks enforcement of these releases and the injunctions as contemplated by the D&O/Insurer Global Settlement Agreement.

52.    Section 1521(a) of the Bankruptcy Code provides that, upon recognition of a foreign proceeding, and "where necessary to effectuate the purpose of this chapter and to protect the assets of the debtor or the interests of any creditors, the court may grant any appropriate relief . . . ."  11 U.S.C. § 1521.  Such relief includes, among other things, "granting any additional relief that may be available to a trustee," with certain exceptions that are not relevant here.  *Id.*  Similarly, section 1507 of the Bankruptcy Code provides that, "if recognition is granted," a court "may provide additional assistance to a foreign representative under this title or under other laws of the United States."  11 U.S.C. § 1507.  Finally, section 105(a) of the Bankruptcy Code allows the Court to "issue any order . . . necessary or appropriate to carry out the provisions of [title 11]."

---

Plan and the Sanction Order as they relate to the D&O/Insurer Global Settlement and confirming that the Plan and the Sanction Order as they relate to the D&O/Insurer Global Settlement are binding and effective in the United States, and the Monitor shall use its reasonable best efforts to obtain such recognition order (the "U.S. Recognition Order").").

53.    By the Amended & Restated Initial Order, the Ontario Court expressly requested the assistance of courts in the United States in the following provision:

> [The Ontario Court] hereby requests the aid and recognition of any court, tribunal, regulatory or administrative body having jurisdiction in Canada, the United Kingdom, or in the United States, to give effect to this Order and to assist the [Cash Store Applicants], the Monitor and their respective agents in carrying out the terms of this Order. All courts, tribunals, regulatory and administrative bodies are hereby respectfully requested to make such orders and to provide such assistance to the [Cash Store Applicants] and to the Monitor, as an officer of this Court, as may be necessary or desirable to give effect to this Order, to grant representative status to the Monitor in any foreign proceeding, or to assist the [Cash Store Applicants] and the Monitor and their respective agents in carrying out the terms of this Order.

Amended & Restated Initial Order ¶ 64.[102]

54.    The Plan was specifically addressed in the terms of the Amended & Restated Initial Order and is a product of the relief provided therein. Thus, in addition to the reasons set forth above, this Court should give full force and effect in the United States to the provisions of the Plan relating to the D&O/Insurer Global Settlement Agreement under well-established principles of international comity and pursuant to sections 105(a), 1507, and 1521 of the Bankruptcy Code.

---

[102]    *See also* Meetings Order ¶ 57 ([The Ontario Court requests] the aid and recognition of other Canadian and foreign Courts, tribunal, regulatory or administrative bodies to act in aid of and to be complementary to [the Ontario Court] in carrying out the terms of this Order where required. All courts, tribunals, regulatory and administrative bodies are hereby respectfully requested to make such orders and to provide such assistance to the [Cash Store Applicants] and to the Monitor, as an officer of [the Ontario Court], as may be necessary or desirable to give effect to this Order, to grant representative status to the Monitor in any foreign proceeding, or to assist the [Cash Store Applicants] and the Monitor and their respective agents in carrying out the terms of this Order.").

## CONCLUSION

WHEREFORE, the Monitor respectfully requests that this Court grant this Petition and enter the Proposed Order recognizing the Canadian Proceeding as a "foreign main proceeding," enforcing the Plan in the United States as it relates to the D&O/Insurer Global Settlement Agreement, and granting such other relief as is appropriate under the circumstances.


Dated: New York, New York
      October 16, 2015

**ALLEN & OVERY LLP**

By: */s/ Ken Coleman*           
Ken Coleman
Mark Nixdorf
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 610-6300
Facsimile: (212) 610-6399
ken.coleman@allenovery.com
mark.nixdorf@allenovery.com

*Attorneys for FTI Consulting Canada Inc., as*
*Monitor and Foreign Representative of*
*The Cash Store Financial Services Inc.*

## VERIFICATION

Pursuant to 28 U.S.C. § 1746, Jeffrey Rosenberg declares as follows:

I am a Managing Director and duly authorized agent of FTI Consulting Canada Inc., which was appointed as the monitor and authorized to act as foreign representative of The Cash Store Financial Services Inc., The Cash Store Inc., TCS Cash Store Inc., Instaloans Inc., 7252331 Canada Inc., 5515433 Manitoba Inc., and 1693926 Alberta Ltd. d/b/a "The Title Store". I have full authority to verify the foregoing *Verified Petition for Recognition of Foreign Proceeding and Related Relief* (the "**Petition**"). I have read the Petition, and am informed and do believe that the allegations contained therein are true and accurate to the best of my knowledge, information, and belief.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this _16_<sup>TH</sup> day of October, 2015, in Toronto, Ontario, Canada.

_____

Jeffrey Rosenberg
Managing Director
FTI Consulting Canada Inc.

# **EXHIBIT A**

## ***Proposed Order***

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------x
In re:                                                      :    Chapter 15
                                                            :
THE CASH STORE FINANCIAL SERVICES INC.,    :
                                                            :    Case No.  ___-_____ (___)
Debtor in a Foreign Proceeding.              :
                                                            :
-------------------------------------------------------------------x

## ORDER GRANTING RECOGNITION AND RELATED RELIEF

**THIS MATTER** was brought before the Court by FTI Consulting Canada Inc., the

court-appointed monitor (the "**Monitor**") and authorized foreign representative of The Cash Store

Financial Services Inc. ("**CSF**"), The Cash Store Inc., TCS Cash Store Inc., Instaloans Inc., 7252331

Canada Inc., 5515433 Manitoba Inc., and 1693926 Alberta Ltd. d/b/a "The Title Store",[1] in a

proceeding (the "**Canadian Proceeding**") under Canada's *Companies' Creditors Arrangement Act*,

R.S.C. 1985, c. C-36, as amended, pending before the Ontario Superior Court of Justice, Commercial

List (the "**Ontario Court**").

The Monitor filed a *Verified Petition for Recognition of Foreign Proceeding and*

*Related Relief* on October 16, 2015 (the "**Petition**"),[2] commencing the above-captioned case under

chapter 15 of title 11 of the United States Code (as amended, the "**Bankruptcy Code**") and seeking the

entry of an order (i) recognizing the Canadian Proceeding as a "foreign main proceeding" under section

1517 of the Bankruptcy Code and (ii) giving full force and effect in the United States to certain

provisions of the Plan, as approved by the Plan Sanction Order annexed hereto as Exhibit 1, including

any extensions or amendments thereof authorized by the Ontario Court.

---

[1]    CSF, The Cash Store Inc., TCS Cash Store Inc., and Instaloans Inc. have formally changed their names and are currently registered as the
following Ontario and Alberta numbered companies: 1511419 Ontario Inc., 1545688 Alberta Inc., 986301 Alberta Inc., and 1152919 Alberta
Inc.

[2]    Capitalized terms used but not defined herein shall have the meanings assigned to them in the Petition.

The Court has considered and reviewed the Petition and the other pleadings and exhibits submitted by the Monitor in support thereof.  No objections were filed to the Petition.

After due deliberation and sufficient cause appearing therefore, the Court finds and concludes as follows:

(A)        this Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, 11 U.S.C. §§ 109(a) and 1501;

(B)        this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(P);

(C)        venue is proper in this District pursuant to 28 U.S.C. § 1410(2) and (3);

(D)        the Monitor is a "person" within the meaning of 11 U.S.C. § 101(41) and is the duly appointed "foreign representative" of CSF within the meaning of 11 U.S.C. § 101(24);

(E)        the case was properly commenced pursuant to 11 U.S.C. §§ 1504 and 1509, and the Petition meets the requirements of 11 U.S.C. §§ 1504 and 1515;

(F)        the Canadian Proceeding is a foreign proceeding within the meaning of 11 U.S.C. § 101(23);

(G)        the Canadian Proceeding is entitled to recognition by this Court pursuant to 11 U.S.C. § 1517;

(H)        the Canadian Proceeding is pending in Canada, where CSF has its center of main interests within the meaning of 11 U.S.C. § 1502(4), and as such constitutes a "foreign main proceeding" pursuant to 11 U.S.C. § 1502(4) and is entitled to recognition as a foreign main proceeding pursuant to 11 U.S.C. § 1517(b)(1);

(I)        the Monitor is entitled to all relief afforded foreign main proceedings upon recognition pursuant to 11 U.S.C. § 1520 and supplemental relief pursuant to 11 U.S.C. §§ 105, 1507 and 1521; and

(J)        the relief granted herein is necessary and appropriate, in the interest of the public and international comity, and consistent with the public policy of the United States.

NOW, THEREFORE, IT IS HEREBY ORDERED AS FOLLOWS:

1.        The Canadian Proceeding is hereby recognized as a foreign main proceeding pursuant to section 1517(b)(1) of the Bankruptcy Code, and all relief under section 1520 of the Bankruptcy Code shall apply in this case.

2.      The releases contained in sections 7.1 (c), (d), (f), (g) and (n) of the Plan as contemplated by D&O/Insurer Global Settlement Agreement, and the injunctions contained in section 7.3 of the Plan, as approved by the Plan Sanction Order, are hereby given full force and effect in the United States pursuant to sections 105, 1507 and 1521 of the Bankruptcy Code.

3.      This Court shall retain jurisdiction with respect to the enforcement, amendment or modification of this Order, any request for additional relief or any adversary proceeding brought in and through these cases, and any request by an entity for relief from the provisions of this Order, for cause shown, that is properly commenced and within the jurisdiction of this Court.

4.      The Petition and supporting papers shall be available upon request at the offices of Allen & Overy LLP, 1221 Avenue of the Americas, New York, New York 10020 to the attention of Mark Nixdorf, (212) 610-6300, mark.nixdorf@allenovery.com.

5.      Notwithstanding Bankruptcy Rule 7062, made applicable to these cases by Bankruptcy Rule 1018, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry, and upon its entry, this Order shall become final and appealable.

Dated: New York, New York
          _____ \_\_, 2015

                                      _____
                                      United States Bankruptcy Judge

## EXHIBIT 1

**Plan Sanction Order**

[PENDING]